**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and BROWN, JJ.**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**June 29, 2020**

# In the Court of Appeals of Georgia

A20A0327. CARLTON v. THE STATE.

RICKMAN, Judge.

Following a jury trial at which he acted pro se, Lewis Alan Carlton was convicted on six counts of criminal attempt to commit the felony of aggravated stalking. Following the denial of his motion for new trial, Carlton appeals. He urges that the evidence was insufficient to sustain the verdict. He also contends that the trial court erred by denying his general demurrer, by allowing bad character evidence at trial, and by ruling against Carlton's use of certain records from the Department of Family and Children Services (DFACS). We hold that the court erred by allowing the bad character evidence and that the error was not harmless. We therefore reverse and remand.

Construed in favor of the verdict, see *Jackson v. Virginia*, 443 U. S. 307 (99

SCt 2781, 61 LE2d 560) (1979), the evidence presented at trial shows that when he

was approximately 44 years old, Carlton met N. S., who was age 15 or 16 at the time.

The couple lived together for the ensuing four or five years and had three children

who were the subject of a deprivation proceeding that began in 2008, and a

proceeding for the termination of his parental rights that began in 2012. Both the

deprivation proceeding and the termination proceeding continued through 2014, when

Carlton's parental rights were terminated (the "Termination Order").

Meanwhile, in November 2008, during the deprivation proceeding, the Juvenile

Court of Cobb County entered an order in which it found the two older children

deprived and further ruled that Carlton have "no visitation nor contact with the

children unless he petitions this court in the future for such visitation and contact[,]

and this court grants such relief" (the "Deprivation Order").[1] In March 2011, the

children were placed with foster parents who eventually adopted the children. Later,

---

[1] In April 2009, the juvenile court found the youngest child to be deprived, as well. The court ordered that "the mother shall insure the named father (Lewis Alan Carlton) has no visitation nor contact with the child unless he petitions this court in the future for such visitation and contact and this court grants such relief."

the juvenile court denied various requests by Carlton to modify any pending orders prohibiting his visitation with the children.

Then in October 2012, in the Superior Court of Cobb County, Carlton pled guilty pursuant to a negotiated plea agreement to three counts (Count Nos. 4, 6, and 7) of impersonation of a public employee, a DFACS worker. The conviction stemmed from Carlton having called the foster family's neighbor posing as a DFACS employee in an attempt to glean information about his children during their placement with the foster family; in the call, he suggested that the children had been abused in the foster home. The court sentenced Carlton on Count 4 to five years to serve and separately on Count 6 and 7 to ten years, one to serve, consecutive to Count 4, with the remainder on probation (the "Criminal Sentence"). On the signed sentencing form for Count 4, the trial court marked out all general and special conditions of probation. On the separate sentencing forms for Counts 6 and 7, the court set forth general and special conditions of probation, including, as shown on "Addendum A," that Carlton "shall have no contact with his children unless an order from Cobb County Juvenile Court allows it."

Thereafter, Carlton sent two items of correspondence to his children that led to the current charges. In early 2014, Carlton sent a postcard from prison addressed

3

to all three children at the address of their foster parents. Two months later, Carlton sent a letter addressed in the same manner. When the foster mother received the postcard and the letter, she called the police; the children never saw the two items.

The foster mother testified that during the time that the children had been in her care, Carlton was not allowed to have physical contact with the children or to send correspondence. She explained that "from the very first time we got the kids, we were told that he had a no-contact order."

The mother and father also testified to other instances of Carlton's behavior, including that Carlton attempted to watch the foster family from bushes in a park, drove through their neighborhood, called the foster father on his cell phone, and sent gifts to the children that included messages for the children secreted in the packaging or written on the gifts themselves, including his own phone number.

Carlton was indicted on six counts of criminal attempt to commit aggravated stalking under OCGA § 16-5-91 (a), three counts for sending the postcard (one for each of his three children), and three more counts for sending the letter. In the indictment, the State averred that Carlton took a substantial step toward the crime by sending his children the postcard and letter in violation of "Cobb County Superior Court Case Number 12-9-3781-49," which is the criminal case that resulted in the

4

Sentencing Order, and "Cobb County Juvenile Court Case Number 12-CV-5159-04," which is the termination proceeding that led to the Termination Order.

On the third day of the jury trial, Carlton filed a written general demurrer and raised the issue orally. The court denied Carlton's request.

Following trial, Carlton was found guilty on the six counts related to the postcard and the letter.[2] He was sentenced to 30 years confinement, five years to serve for each count, to run consecutively to each other, with the entire sentence to run consecutively to his then-current incarceration. Following the denial of his motion for new trial, Carlton appeals.

1. Carlton first contends that the trial court erred by denying his general demurrer alleging a fatal defect in the indictment. Appellate courts review the trial court's ruling on this issue de novo to determine whether the allegations in the indictment are legally sufficient. See *State v. Cohen*, 302 Ga. 616, 618 (1) (807 SE2d 861) (2017).

"[A] general demurrer challenges the substance of the indictment and asserts that the indictment is fatally defective and incapable of supporting a conviction." (Citation, punctuation, and emphasis omitted.) *Williams v. State*, 307 Ga. 778, 782

---

[2] Carlton was charged but acquitted on a seventh count.

(2) n.6 (838 SE2d 235) (2020). "If a defendant can admit each and every fact alleged in the indictment and still be innocent of any crime, the charge is subject to a general demurrer." *State v. Heath*, _ Ga. _ (Case No. S19G0967, decided June 1, 2020).

Carlton contends that the court erred because the indictment fails to set forth a specific order prohibiting him from contacting the children; violation of a court order then in effect is an element of the crime of aggravated stalking. See OCGA § 16-5-91 (a).[3]

Carlton argues that the two cases identified in the indictment do not include orders that prohibited him from contacting his children that were in effect at the time that he sent the postcard and letter. This argument requires looking beyond the face of the indictment. And "[a]s a general matter, a demurrer (whether general or special)

---

[3] OCGA § 16-5-91 (a) provides,
A person commits the offense of aggravated stalking when such person, in violation of a . . . temporary restraining order, temporary protective order, permanent restraining order, permanent protective order, . . . condition of probation, or condition of parole in effect prohibiting the behavior described in this subsection, follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person.

6

must allege some flaw on the face of the indictment itself; a demurrer ordinarily cannot rely on extrinsic facts that are not alleged in the indictment." *State v. Williams*, 306 Ga. 50, 53 (2) (829 SE2d 117) (2019) (also recognizing an exception to the general rule "[i]f the State stipulates or agrees to the facts that form the basis for the charges in the indictment").

We find no error on the face of the indictment. Somewhat inartfully, the indictment set out that Carlton's postcard and letter violated OCGA § 16-5-91 (a) in that he sent the postcard and letter in violation of two entire cases. Thus, Carlton was on reasonable notice of the crime charged — aggravated stalking — and the manner in which it was committed — sending the postcard and letter in violation of a court order that could be contained in one of the cases listed. See generally *Miller v. State*, 305 Ga. 276, 281 (3) (824 SE2d 342) (2019); *State v. Holmes*, 142 Ga. App. 847, 848 (237 SE2d 406) (1977) ("An indictment which sets out the essential elements of the crime charged, so as to apprise the accused of the exact offense charged and the manner in which it was committed is sufficient as against a general demurrer.").

2. Carlton's challenge to the sufficiency of the evidence is without merit.

"The burden of proof rests upon the State to prove every material allegation of the indictment and every essential element of the crime charged beyond a reasonable

doubt." (Citation and punctuation omitted.) *Davis v. State*, 330 Ga. App. 118, 122 (2) (766 SE2d 566) (2014). On appeal, "we do not weigh the evidence or determine witness credibility, but instead construe the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the verdict." *Hinton v. State*, 319 Ga. App. 673, 675 (738 SE2d 120) (2013).

(a) Carlton first contends, in essence, that there was a fatal variance between the indictment and the proof at trial because the State did not introduce such evidence of a no-contact order from either of the two cases listed in the indictment that was in effect at the time he sent the postcard and letter. It is true that the State failed to introduce a no-contact order from either of the two cases listed in the indictment, but the State showed that Carlton violated the no-contact provision found in the Deprivation Order, which was sufficient under the law.

Carlton was charged with a violation of OCGA § 16-5-91 (a), which requires proof that the defendant stalked the victim in violation of a court order then "in effect." See also *Ward v. State*, 351 Ga. App. 490, 495-496 (831 SE2d 199) (2019) (physical precedent only). The indictment alleges that Carlton attempted to stalk his children in violation of his criminal case and the termination proceeding, not specific orders. The only evidence introduced from those two cases was the Criminal Sentence

and the Termination Order. In the Criminal Sentence, the no-contact order pertained only to Counts 6 and 7, which he was not yet serving at the time he sent the postcard and letter.[4] The Termination Order itself post-dated when Carlton sent the postcard and letter, and there is nothing therein identifying earlier orders in that proceeding that prohibited Carlton from contact with the children.

Although this creates a variance between the indictment and the evidence, not all variances are fatal. See *Lawson v. State*, 278 Ga. App. 852, 853 (2) (630 SE2d 131) (2006). Rather, what is required of an indictment is that

> An accused must be definitely informed of the charges against him so that he may present a defense, and he must be protected against a second prosecution for the same offense. If a variance does not present these dangers, it is not fatal.

---

[4] In Count 4, Carlton was sentenced to five years to serve, with no probation. And Carlton's sentence on Counts 6 and 7 was to be served consecutively to Count 4. Carlton was sentenced on Count 4 less than two years before he sent the letter and the postcard. The State presented no evidence that he had transitioned, for any reason, to serving his sentence on Count 6 or 7. Accordingly, there is no evidence in the record to support the conclusion that at the time he sent the postcard and letter Carlton was subject to the no-contact provision pertaining to Counts 6 and 7 of the Criminal Sentence. See, e.g, *Etchison v. State*, 175 Ga. App. 723, 723 (334 SE2d 324) (1985) (probation was granted only on second count).

9

(Citation and punctuation omitted.) Id. See also *Fields v. State*, 281 Ga. App. 733, 735 (1) (a) (637 SE2d 136) (2006), disapproved on other grounds by *Schofield v. Holsey*, 281 Ga. 809 (642 SE2d 56) (2007), and *State v. Lane*, _ Ga. _ (838 SE2d 808) (2020).

In *Fields*, the defendant engaged in domestic violence, and his wife obtained a series of protective orders. *Fields*, 281 Ga. App. at 733. Fields was later arrested for threatening his wife and granted a bond. Id. at 734.[5] As a condition of his bond, he was ordered to have no contact with the victim. *Fields*, 281 Ga. App. at 733-734. When Fields later set fire to the victim's home, he was again arrested and indicted for arson and aggravated stalking because he had violated "a protective order." Id. Fields showed that he violated only the bond condition following his first arrest, not a protective order from proceedings that occurred before that. Id. at 734 This Court held that the discrepancy was not fatal because Fields was effectively charged with violating "a court order," that he was not surprised by the charges, and that he was not vulnerable to being prosecuted for the same offense a second time. Id. at 735 (1) (a); see also *State v. Carlisle*, 280 Ga. 770 (631 SE2d 347) (2006) (the exact type of order

---

[5] Fields eventually pled guilty to aggravated stalking based on this incident. Id. at n.2.

being violated is not material so long as the defendant was aware that a court order was in effect that prohibited contact); *Vaughn v. State*, 301 Ga. App. 55, 57-58 (1) (b) (686 SE2d 847) (2009), overruled on other grounds by *State v. Kelly*, 290 Ga. 29 (1) (718 SE2d 232) (2011).

We find *Fields* applicable here. The State presented evidence that Carlton was subject to a no-contact provision in the Deprivation Order, as well as evidence that the juvenile court denied subsequent requests by Carlton that he be allowed visitation. Also, Carlton has not claimed surprise as to the charges against him, and he is not vulnerable to being prosecuted again for the same offense of sending the same postcard and letter in violation of a court order. See *Kinney v. State*, 223 Ga. App. 418, 420 (1) (477 SE2d 843) (1996) (defendant could not be prosecuted for aggravated stalking for contacting his wife in violation of a court order where he had previously been convicted of a violation of the Family Violence Act based on the same actions that violated the same earlier court order). As a result, there was no fatal variance between the charges and the proof. See *Fields*, 281 Ga. App. at 736 (1) (a).

(b) Carlton also asserts that the State failed to show that his attempted contact was done "for the purpose of harassing and intimidating the [children]," OCGA § 16-5-91 (a), or that he engaged in a "pattern of activity" for that purpose.

11

"[E]ven a single violation of a protective order may violate OCGA § 16-5-91 (a) if that violation is part of a pattern of harassing and intimidating behavior." (Citations and punctuation omitted.) *Jenkins v. Jenkins*, 348 Ga. App. 290, 293 (822 SE2d 404) (2018). "Although the aggravated stalking statute does not define 'harassing and intimidating,' the phrase is defined in the simple stalking statute, OCGA § 16-5-90 (a) (1)." *Brooks v. State*, 313 Ga. App. 789, 791 (1) (723 SE2d 29) (2012). That statute defines "harassing and intimidating" as a

> knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose.

OCGA § 16-5-90 (a) (1).

Here, Carlton was charged with *attempted* aggravated stalking. And the evidence showed that Carlton repeatedly tried to get messages to his children, including his own phone number, in violation of court orders. Although these messages were intercepted by the foster mother, it was up to the jury to decide whether Carlton's repeated attempt to contact the children was for the purpose of harassing or intimidating them. See *Oliver v. State*, 325 Ga. App. 649, 652 (1) (753

12

SE2d 468) (2014) ("[I]n determining whether the evidence shows a pattern of harassing and intimidating behavior, the jury can consider any number of factors, including, but not limited to, the prior history between the parties, the defendant's surreptitious conduct, as well as her overtly confrontational acts, and any attempts by the defendant to contact, communicate with, or control the victim indirectly, as through third parties.") (citation and punctuation omitted.) In sum, the evidence was sufficient to support the conviction. See *Jackson*, 443 U. S. 307.

3. Carlton contends the trial court erred by allowing the State to introduce the Termination Order and by failing to redact references in that order stating that he had a history of sexual deviancy and domestic abuse.[6] He also contends the trial court erred by allowing evidence showing that he was incarcerated at the time that he sent the letter and postcard, i.e., the return address on the postcard and letter. We review a trial court's decision on the admission of evidence for an abuse of discretion. *Jenkins v. State*, 303 Ga. 314, 316 (2) (812 SE2d 238) (2018).

---

[6] To the extent Carlton contends, without citation to the record, that the trial court erred by allowing evidence of unspecified felonious criminal activity, unspecified other evidence of bad character, and unspecified evidence of "parental unfitness," he has waived appellate review. See *Collins v. State*, 326 Ga. App. 181, 184 (6) (756 SE2d 269) (2014).

13

(a) Evidence of sexual abuse. Carlton objected to references to prejudicial information in the Termination Order and the trial court agreed to redact such information with the exception of references to his past "sexual deviancy." Carlton objected on grounds that the information was not relevant; that the Termination Order was issued months after he sent the postcard and letter; that the statements about sexual deviancy were prejudicial, inflammatory, and would bias the jury against him; and that much of that behavior took place many years before his children were born. The State argued that the evidence was relevant to show that the juvenile court terminated Carlton's parental rights, not because he failed to maintain a relationship with the children, but because he had, among other things, a history of sexually deviant behavior. The trial court refused to redact the references to this conduct. Accordingly, the redacted Termination Order was admitted into evidence; it contains numerous statements about Carlton's history of sexually deviant behavior.[7]

_____

[7] The statements include the following: "The father has a history of sexually deviant behavior including sexually deviant behavior toward persons under the age of sixteen"; "the father's historical pattern of sexually deviant behavior is particularly disturbing given the knowledge that his then five-year-old daughter had in regard to his nudity and sexual activity"; "the father's historical pattern of sexually deviant behavior [is] destructive behavior that is inconsistent with the behavior needed to properly parent minor children"; "the evidence of the father's sexually deviant behavior . . . overwhelmingly supports a termination of the father's parental rights"; "[t]he father began a sexual relationship with the mother[,] a naive teenager, and

14

(1) The State argues that Carlton opened the door to this evidence during his opening statement and during the cross examination of the foster mother.

In his opening statement, Carlton asked the jury to consider whether he had a meaningful relationship with his children and argued that sending the postcard and letter were an attempt on his part to maintain such a relationship, which was necessary to avoid having parental rights terminated. He also stated that he was always "fighting" to get his children back during the "custody battle." On cross-examination of the foster mother and father, Carlton repeatedly questioned them about whether his actions were indicative of a parent fighting to preserve his parental rights.

We disagree that Carlton opened the door to evidence of his sexual history. First, even if it is possible to open the door to introduction of bad character evidence during opening statement,[8] there was virtually no connection between what Carlton stated during his opening or during cross-examination of the foster parents, and his past history of "sexual deviancy."

essentially isolated her for his sexual pleasure"; "the father has a history of sexually deviant behavior including sexual abuse of minor children"; and other similar references.

[8] See *Holt v. State*, 352 Ga. App. 504, 507 (1) (a), n.2 (835 SE2d 336) (2019).

15

(2) Moreover, the evidence itself was at best marginally relevant to the State's case and any probative value was substantially outweighed by its prejudicial effect. See OCGA §§ 24-4-403 ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"); 24-4-404 (a) ("Evidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion[.]").[9]

The only two possible justifications for admitting this information were (1) that the State had to prove that sending the postcard and letter were part of a pattern of activity for the purpose of harassing and intimidating the children, see OCGA § 16-5-91 (a), and (2) that the State was authorized to introduce evidence of the prior history/relationship between Carlton and the victims. See *Fields*, 281 Ga. App. at 738. The State did not show that either concerns Carlton's past sexual practices, with the possible exception of a reference to one child's knowledge of his "nudity and sexual activity," which, as shown in the unredacted Termination Order, occurred "either unintentionally or intentionally." In other words, this is *not* a case where Carlton's history of sexual behavior appears to involve intentional acts against his children who

---

[9] It does not appear that the State attempted to introduce "other acts" evidence in accordance with OCGA § 24-4-404 (b).

16

were the subject of the no-contact order. Thus, the relevance of this evidence to the State's case is very thin.

This thin, marginal evidence was so strongly prejudicial that the prejudicial effect greatly outweighed any possible probative value; accordingly, it should not have been admitted. See *Herring v. State*, 288 Ga. App. 169, 173 (2) (b) (653 SE2d 494) (2007) ("In order to introduce evidence of a defendant's lustful disposition, the State must link those practices to the specific crime charged."). Simply put, upon review of the facts presented here, the fact that Carlton had a previous history of sexual deviancy was barely relevant to the issue of whether he attempted to violate a no contact order.

We therefore hold that the trial court abused its discretion by allowing introduction of the numerous references to Carlton's sexual deviancy. See *Hines v. State*, 353 Ga. App. 710, 713-714 (2) (839 SE2d 208) (2020) (court abused its discretion during trial of the mother for cruelty to children by admitting evidence referring to mother as the "maltreater").

(b) We now address the question of harm.

The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. When

17

applying harmless error analysis, we review the evidence de novo and weigh it as a reasonable juror would, rather than reviewing it in a light most favorable to upholding the jury's verdicts of guilty.

(Citations and punctuation omitted.) *Taylor v. State*, 306 Ga. 277, 283 (2) (830 SE2d 90) (2019). Given the highly disputed evidence about whether, by sending the postcard and the letter (containing only innocuous language), Carlton was attempting to harass or intimidate the children, we find the error was not harmless. Accordingly, we reverse the denial of Carlton's motion for new trial and remand for proceedings consistent with this opinion.[10] See *Hines*, 353 Ga. App. at 714 (2); see also *Garduno v. State*, 299 Ga. App. 32, 33 (2), n.4 (682 SE2d 145) (2009) (case may be retried upon remand).

(c) With regard to admission of Carlton's return address on the postcard and letter, which showed that he was incarcerated at the time he sent them, the evidence was cumulative of the Sentencing Order, which showed that less than two years

---

[10] With regard to references to Carlton's history of domestic abuse, we find no indication that Carlton objected below to such references as found in the redacted Termination Order. Accordingly, our review would normally be for plain error only. See *Gipson v. State*, 332 Ga. App. 309, 314 (3) (772 SE2d 402) (2015). But, because we are reversing and remanding for a new trial during which Carlton may object to such evidence, we need not perform any review.

earlier, he had been incarcerated for at least six years. See *Hamilton v. State*, _ Ga. _ (3) (Case No. S20A0483, decided June 1, 2020).

4. Finally, Carlton contends the trial court erred in a series of rulings regarding obtaining and using DFACS records at trial. Because Carlton may renew his motions upon remand, we need not determine whether the trial court erred in its various rulings in response to Carlton's requests. We note, however, that any aspect of the DFACS records at issue that might show that Carlton was not subject to a no-contact order at the time he sent the postcard and letter would clearly be relevant to the case.

*Judgment reversed, and case remanded. Dillard, P. J., and Brown, J., concur.*